# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
Case No.:

H.C., a minor, by and through his parent and natural
guardian, Jenny C.; J.E., a minor, by and through his
parent and natural guardian, Nehomie Perceval; M.F.,
a minor, by and through his parent and natural
guardian, Asisa Rolle; and T.M., a minor, by and
through his parent and natural guardian, Jessica
Joiner, on behalf of themselves and all others
similarly situated,

Plaintiffs,

      v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity, et al.

Defendants.

## DECLARATION OF LOUIS J. KRAUS, M.D.

I, Louis J. Kraus, pursuant to 28 U.S.C. § 1746, declare as follows:

1

1.     This declaration is submitted in support of the Plaintiffs' Motion for a Preliminary Injunction. If called upon to testify, I could and would do so competently as follows.

QUALIFICATIONS

2.     I am currently Professor and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois.  In that capacity, I supervise and train child and adolescent psychiatry fellows in various placements, including in in-patient, residential treatment, and outpatient programs for children, adolescents, and young adults. I am also currently the Psychiatric Director at the Sonia Shankman Orthogenic School, a residential treatment program for children and adolescents in need of support for profound emotional issues; the Director of the Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center; and the Medical Director of the Chicago Metropolitan Easter Seals Therapeutic School, a school providing a continuum of services for children with autism. I also have a private practice where I assess and treat children and adolescents and provide therapy and psychopharmacological services.

3.     I have worked with juveniles in correctional settings for the past 26 years, including for nine years from 1990 to 1999 as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois.  From 2003 to 2004, I was a consultant to the Civil Rights Division of the United States Department of Justice on a Civil Rights of Institutionalized Person Act ("CRIPA") investigation in Maryland.  I also consulted with the American Civil Liberties Union of Illinois in a case challenging conditions in the Cook County Juvenile Temporary Detention Center, which resulted in system-wide restructuring of mental health services for juveniles held in

2

pre-trial detention.  I have served as a consultant on various other correctional and juvenile justice matters.

4.  I have been appointed to serve as monitor in consent decrees involving reform in juvenile justice systems in Arizona and Illinois, both of which included reform to the use of solitary confinement against juveniles in those systems.  In my role in Illinois, which is currently ongoing, I am assessing and restructuring the mental health programming of the Illinois Department of Juvenile Justice.  *See R.J v. Bishop,* No. 1:12-cv-07289 (N.D. Ill.).  In the Arizona case, I assisted the Department of Justice from 2005 to 2008 in restructuring the mental health, medical services, and dental services in two state facilities.  *See United States v. Arizona,* No. 2:04-cv-01926-EHC (D. Ariz.).

5.  I have also been involved in special education consulting and development of Individualized Education Programs ("IEPs") for the past twenty-two years.  I am currently a consultant on special education issues to over fifteen school districts in Illinois.  I typically complete one or two educational evaluations each week to assist with developing IEPs and attend IEP meetings.  I have testified regarding special education issues in due process hearings under the Individuals with Disabilities Education Act ("IDEA") as well as in other civil cases.

6.  I have authored a number of publications on treatment of juveniles in correctional settings.  I am the primary author of the American Academy Child and Adolescent Psychiatry's ("AACAP") Policy Statement on Solitary Confinement.  I co-edited two monographs on juvenile justice reform for the AACAP, co-edited a book through Cambridge University Press entitled *The*

3

*Mental Health Needs of Young Offenders,* and, most recently, edited a book through the Child and Adolescent Psychiatric Clinics of North America entitled *Adjudicated Youth,* published in January of 2016.  I wrote the Practice Parameter for Child and Adolescent Forensic Evaluations for child and adolescent psychiatry, which was published in the Journal of Child and Adolescent Psychiatry.

7.      I have served in a number of professional appointments in my field.  From June 2014 to 2015, I served as the chair-elect of the American Medical Association's Council on Science and Public Health, and from 2015 to 2016, I served as chair.  From May 2012 to May 2015, I was the chair of the American Psychiatric Association's Council on Children, Adolescents and Their Families, which I had served in for 18 years.  From October 2000 to October 2015, I was the chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013, I was chair of the AACAP Assembly.

8.      I was on the Board of Directors of the National Commission of Correctional Health Care ("NCCHC") from 1997 to 2003.  I was appointed chairman of the NCCHC Committee on Juvenile Health Care from 1999 to 2003, and served as vice-chairman of the same committee in 1998.

9.      I obtained my Doctor of Medicine degree, M.D., from the Chicago Medical School in 1987 and my Bachelor of Science degree, B.S., from Syracuse University in 1983.

10.     I have included a copy of my Curriculum Vitae as <u>Exhibit B-1</u>.

<u>INVOLVEMENT IN THIS CASE</u>

4

11.     In this present case, I was retained by the law firm of Cohen Milstein Sellers and Toll, the Legal Aid Society of Palm Beach County, Inc. and the Human Rights Defense Center (together, "Plaintiffs' counsel") to perform professional services as an expert in connection with litigation challenging the use of solitary confinement on juveniles (16- and 17-year-olds) at the Palm Beach County Jail Main Detention Center (the "Jail").  The Jail is operated by the Palm Beach County Sheriff s Office ("PBSO").

12.     For the purpose of preparing this declaration I reviewed a number of documents provided to me by Plaintiffs' counsel, including: 1)   PBSO Inmate Rules; 2) PBSO Inmate Classification Process; 3) PBSO Juvenile Admission, Classification and Housing; 4) PBSO and Palm Beach School Board ("School Board") Cooperative Agreement; 5) No Place for a Child: Direct File of Juveniles, Policy Brief (James Madison Institute, Feb. 2017); 6) Destined to Fail: How Florida Jails Deprive Children of Schooling (Southern Poverty Law Center, Feb. 2018); 7) Declaration of H.C.; 8) Declaration of T.M.; 9) Declaration of J.E.; 10) Declaration of M.F.; 11) Declaration of W.G.; 12) Declaration of Jeziah Guagno ("J.G."); 13) Declaration of Jeff Omelus ("J.O."); 14) Declaration of Brice Daniels ("B.D."); 13) Declaration of Nehomie Perceval; 14) Declaration of Asisa Rolle; 15) Declaration of Jessica Joiner; 16) Declaration of Jenny C.; 17) 504 Plan and Evaluation re: J.E.; 18) IEP and Evaluation re: M.F.; 19) IEP of T.M.; 20) IEP, conference notes, and Educational and Psychological Evaluation re: J.G.; 21) IEP, conference notes, and Evaluation re: W.G.; 22) Evaluation of Brice Daniels; and 23) Draft Class-Action Complaint for Declaratory and Injunctive Relief.

5

13.     In forming my opinions below, I relied on my review of the documents referenced above.  I also relied on my academic and clinical experience, as well as the extensive body of literature regarding the psychiatric effects of solitary confinement, cognitive and behavioral development in adolescents, and juveniles in correctional settings.

14.     It is my understanding that as the litigation progresses, I will be reviewing additional documents and information regarding the Jail and the detained juveniles, and that I will be providing additional services and opinions based on those documents and information.

15.     I am being compensated at the rate of $400 per hour to prepare this declaration, and my compensation is not dependent on my opinions or the outcome in this matter.

## OPINIONS AND BASES OF OPINIONS

### I.   THE SHERIFF'S OFFICE HAS A POLICY AND PRACTICE OF IMPOSING SOLITARY CONFINEMENT ON JUVENILES.

16.     It is the policy and practice of the Palm Beach County Sheriff s Office to hold juveniles in solitary confinement (the "Box") for administrative or disciplinary reasons. Disciplinary solitary confinement stems from violation of facility rules and regulations. As discussed below, jail staff do not appear to make any manifestation determinations to evaluate whether a rule violation was a product of the juveniles mental health or other disabilities. Moreover, even though the Sheriff's Office policy includes procedures for a pre-segregation hearing and review by the "watch commander or designee," the juveniles report that the Sheriff Office's actual policy and practice is to hold no such hearing, review or other form of due process

6

prior to their solitary confinement. Further, the Sheriff Office's policy states that such disciplinary confinement shall be no longer than 30 days, but again, the actual policy and practice implemented holds these children much longer without any review or re-classification. Additionally, despite Sheriff's Office policy calling for 10-minute checks on the juveniles, in reality these are rarely, if ever, done. According to the Sheriff's Office policy, administrative solitary confinement is imposed when the juvenile "poses a serious threat to life, property, self, staff, or other inmates." In reality, the Sheriff's Office implements a blanket policy and practice of holding juveniles indefinitely in solitary confinement when there is another co-defendant (or "keep-aways") in the same housing unit.

17.     The juveniles are held in cells that are approximately 6' x 12'. There are two windows on the top and bottom of the doors that are scratched up to such a degree that there is very little visibility.

18.     Juveniles in the Box are routinely locked into cells by themselves for between 23 and 24 hours each day. They are denied access to education and other programming. They eat alone in their cells.

19.     Juveniles in the Box are only given at most one hour each day for "recreation" out of their cell. While in the Box, the juvenile is placed in a walled-in, cement floor basketball court during this one-hour period. There is nothing to do in the court and no real "recreation" time.

20.     The juvenile's access to this "recreation", such as it is, is often irregular and can be withdrawn at any time for disciplinary purposes.

7

21.     When the juveniles are in the Box, by rule they cannot talk to other juveniles from their cells. They could be punished with additional discipline when they try to talk to their friends outside of their cell.  Staff come to the door occasionally, but the juveniles can get in trouble if they yell.

22.     Juveniles in the Box do not have access to television or music while they are in their cells.

23.     The term "solitary confinement" does not appear anywhere in the policy manuals of the Jail, but the reality of the Sheriff's Office's policies and practices is synonymous with the definition of "solitary confinement" adopted by professional organizations in the field.   The American Academy of Child and Adolescent Psychiatry defines solitary confinement as a form of discipline or punishment that places an incarcerated individual "in a locked room or cell with minimal or no contact with people, other than staff of the correctional facility." (A true and correct copy of this statement is attached to this declaration as Exhibit B-2.)  The National Commission on Correctional Health Care defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals." (A true and correct copy of this statement is attached to this declaration as Exhibit B-3.)

24.     It is my opinion that the Sheriff's Office's use of disciplinary segregation (including administrative segregation pending a disciplinary hearing) and "keep-away" administrative confinement in the Box constitute solitary confinement as the term is commonly used in the field of child and adolescent psychiatry.  As policy statements in the above paragraph illustrate, what

matters for whether discipline constitutes solitary confinement is the degree of meaningful social

contact with other people and the degree of access to a regular daily curriculum.  This is minimal

in the Box, as the juveniles are alone in their cells for between 23 and 24 hours a day, sometimes

more, with no access to programming and little to no contact with anyone.  Although they do have

contact with the facility staff, these interactions cannot be considered meaningful.

II.  THE SHERIFF'S OFFICE'S USE OF SOLITARY CONFINEMENT PUTS
JUVENILES AT A SUBSTANTIAL RISK OF SERIOUS HARM.

25.     It is my opinion, within a reasonable degree of medical certainty that all juveniles

subjected to the Jail's policy and practice of solitary confinement as described above are at a

substantial risk of serious harm to their social, psychological, and emotional development.

A.  Juveniles in Detention Are As a Group More
Vulnerable to the Risk of Serious Harm From
Solitary Confinement.

26.     Solitary confinement can be dangerous for anyone, but juveniles as a group are

particularly vulnerable to a substantial risk of serious harm from solitary confinement.  Because

juveniles are still developing socially, psychologically, and neurologically, they are especially

susceptible to psychological harm when they are isolated from other people.  Research suggests

that removing them from their regular routines, school, mental health treatment, and opportunities

for interaction with peers can result in long-term lack of trust, hypervigilance, and paranoia.

27.     Solitary confinement negatively impacts juveniles by perpetuating, worsening, or

precipitating mental health concerns, including but not limited to post-traumatic stress disorders,

9

psychosis, anxiety disorders, major depression, hypervigilance, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior.   Research also demonstrates, almost all suicides within juvenile correctional facilities occur when the child is in some type of isolation.

28.     These mental health concerns can cause long-term harm.  Solitary confinement can lead to chronic conditions like depression which, in teenagers, can manifest as anger or as self-harm.  In addition, children who experience depression and anxiety in their teenage years are at a higher risk of presenting with these diagnoses again.  Damage associated with low self-esteem, vegetative features, and hopelessness associated with depression can similarly be long-standing. Depression has a 10-15% mortality rate associated with it, and solitary confinement increases the risk of suicide substantially compared to the general population.

29.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred directed at others.  This makes it difficult to create a trusting, therapeutic relationship and can lead to noncompliance with treatment in the future, making it hard for people to get the help that they need to address the mental health concerns resulting from solitary confinement.

30.     Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm.  In the adolescent brain, the connections between the frontal lobe and the mid-brain have not fully developed.   The mid-brain, which is the part of the brain responsible for the flight-or-fight response, is firing away.   If an adolescent is traumatized in

certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric sequelae (i.e., aftereffect of a disease) like paranoia and anxiety. Trauma such as what is induced by solitary confinement has a high likelihood of causing these permanent changes.

31.     Juveniles in jails are also vulnerable to a substantial risk of serious harm from solitary confinement for the additional reason that they are more likely than the general population to have diagnosed mental illnesses, learning disabilities, and a high incidence of trauma.  Research shows that over 60 percent of the youth in correctional settings have an underlying major mental illness.

32.     There is a clear medical consensus that for those juveniles with mental illness, the risk of serious harm is especially great.  People with mental illnesses already have cognitive deficits in their brain structure or biochemistry.  They already have weakened defensive mechanisms, are at a higher risk for mental health sequelae, and are more susceptible to the significant trauma of social isolation.  The trauma of social isolation that can occur for those with mental illnesses will be more significant and long-lasting than for those without a mental illness.

33.     Medical professionals, including organizations like the American Medical Association, agree that juveniles with mental illnesses should not be placed in solitary confinement for longer than one hour without a comprehensive evaluation from a physician. Solitary confinement should never be used to punish people with mental illnesses.

11

34.     This professional consensus is best reflected in long-standing accreditation standards for isolation in psychiatric hospitals.  The Joint Commission, the most commonly used accreditation agency for psychiatric hospital systems, limits the use of seclusion to the least amount of time possible for the immediate protection of an individual, in situations where less restrictive interventions have been ineffective.  Those standards require that, if a person is placed in seclusion of any kind, after 1 hour alone a physician must assess their well-being.

> B.  <u>Juveniles at the Jail Are Experiencing Serious Harm and Are Exposed to a Substantial Risk of Serious Harm Correlated to the Use of Solitary Confinement.</u>

35.     The documentation regarding the juveniles subjected to solitary confinement at the Jail indicates that many of the juveniles are diagnosed with and have a history of mental illness and learning disabilities, including Attention Deficit Hyperactivity Disorder (ADHD), bipolar, conduct and mood disorders, and intellectual disabilities, which include an IQ below 70. Additionally, many of the children have experienced involvement with the Florida Department of Children and Families, demonstrating prior trauma.

36.     Based on my experience, scientific research, review of the juvenile documentation, and declarations provided by the juveniles, the symptoms of anxiety, frustration, depression, hopelessness, and hallucinations, described by the juveniles directly correlate to being placed in solitary confinement.

37.     In my experience, juveniles placed in solitary confinement also exhibit fear and anxiety, which may lead to increased levels of hopelessness, resulting from the arbitrary nature of the punishment imposed at the Jail.  This sets up an anxiety-provoking situation even when the juveniles are not in solitary confinement, as they are unable to anticipate what behaviors will result in them being put in solitary confinement again.   Furthermore, the open-ended solitary confinement experienced by many of the juveniles at the Jail exacerbates these mental health conditions as they are subjected to seemingly endless amounts of time in isolation.

C.   <u>The Sheriff is Not Assessing or Addressing the Serious Harm or Substantial Risk of Serious Harm Correlated to the Use of Solitary Confinement.</u>

38.     Based on the declarations provided by the juveniles, it is my understanding that there is no mental health worker conducting any mental health screening of juveniles in the Box, or evaluating their mental health while in solitary confinement.  Despite Jail policies that require 10-minute checks of the juveniles held in the box, it appears that this has never been implemented.  Such a practice is inadequate for assessing mental health concerns or the risk of suicide for these already vulnerable children.

39.     Deputies threatening juveniles with relocation to a "psych cell" does not constitute the adequate assessment and treatment of the potential mental health issues of the juveniles in solitary confinement.  In fact, such a practice can have severe short and long-term effects on the mental and emotional well-being of these children.

13

40.     It is my opinion that the Sheriff s Office is failing to address the serious harm or substantial risk of serious harm that is correlated to the use of solitary confinement, especially for juveniles with mental health problems.

### D. The Sheriff's Office Exposes Juveniles to a Substantial Risk of Serious Harm.

41.     It is my opinion that all juveniles subjected to the policy and practice of using solitary confinement at the Jail are exposed to similar types of serious harm or a substantial risk of serious harm described above.  I base this opinion on research demonstrating that juveniles as a group are vulnerable to the risk of serious harm from solitary confinement and research showing that a high percentage of juveniles in detention settings have mental illnesses that exacerbate those risks of harm.

42.     Even juveniles who were or are currently in solitary confinement and not currently exhibiting obvious serious harms as reflected in the Jail's records are at a risk of harm.  Solitary confinement can lead to underlying anxiety, hypervigilance, and other signs of acute stress reactions, and some juveniles are better at minimizing or concealing those effects.  Moreover, the juveniles are at risk of additional harm because they are or can be punished with additional solitary confinement for minor reasons or for no reason at all.

### III. THE SHERIFF'S USE OF SOLITARY CONFINEMENT VIOLATES THE CONSENSUS OF PROFESSIONAL ORGANIZATIONS IN THE FIELD.

43.     The Sherriff's Office's use of solitary confinement violates the norms of professional organizations in the field.  A number of organizations have condemned solitary

14

confinement of children under the age of 18 as a categorical matter, recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement.

44.     The American Academy of Child and Adolescent Psychiatry opposes the use of punitive solitary confinement for juveniles in correctional facilities, recognizing the heinous nature of solitary relevant to adolescents' developmental vulnerabilities and that the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement. *See* Exhibit B-2.

45.     The National Commission on Correctional Health Care, a major accrediting agency, takes the position that juveniles should be excluded from solitary confinement. *See* Exhibit B-3.

46.     The American Medical Association has called for correctional facilities to halt the isolation of juveniles in solitary confinement for disciplinary purposes.  (A true and correct copy of this statement is attached as Exhibit B-4).  The American Psychiatric Association has supported this position statement.

47.     The United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which was approved by the General Assembly in December of 1990, and supported by the United States, specifically prohibit the solitary confinement of juvenile offenders.  (A true and correct copy of the rules is attached as Exhibit B-5).

48.     The World Health Organization has recognized that the UN and other international treaties call for a complete ban on solitary confinement for juveniles and young people, noting the

15

particular vulnerabilities of children, who are developing physically, mentally and socially, and the high rates of mental illness and suicide amongst young people.

### IV. THE SHERIFF'S OFFICE'S USE OF SOLITARY CONFINEMENT IS COUNTERPRODUCTIVE TO SAFETY

49.     Based on my 23 years of academic and professional experience, experience of serving as a federal monitor of correctional facilities in Illinois and Arizona, review of juvenile declarations and additional documentation, my opinion is that the use of solitary confinement at the Palm Beach County Jail is counterproductive to safety.

50.     Solitary confinement inhibits juveniles' ability to cope with stressful situations and leaves them angrier and more disturbed, and therefore leads to more misbehavior and rules infractions.   A more appropriate way of handling misbehavior in juveniles is through the engagement of appropriate de-escalation techniques, mental health interventions, and clear structures for imposing discipline.

### V. CHILDREN WITH DISABILITIES IN SOLITARY CONFINEMENT ARE DEPRIVED OF ACCESS AND DELIVERY OF EDUCATION AND OTHER PROGRAMS

51.     Based on research over the years, 60 to 70 percent of juveniles within detention facilities have an underlying mental illness.  In association with significant mental health issues, these juveniles will also have underlying learning disabilities and other educational struggles.  As a result, a large percentage of juveniles in correctional facilities require special education interventions, including Section 504 plans to provide access to the educational setting and

16

Individual Education Programs (IEPs) to individually tailor instruction, services, and accommodations that students need to have educational progress.

52.     Consistent with this tendency, many of these juveniles appear to have a history of special education.  While these juveniles are eligible for special education services based on Language Impairment (LI), Specific Learning Disability (SLD), Emotional Behavioral Disability (EBD), or Other Health Impairment (OHI), they are denied benefit from their Individual Education Programs (IEPs) due to their solitary confinement.  It is my opinion that the Defendants are aware of the routine denial of educational services and benefit.  IEP conference notes from W.G. include documentation in which a teacher working with him "stated that there were several accom[modations]" that the child "was not able to receive because he was in administrative confinement while at the County Jail".  Similarly, conference notes from an IEP meeting for Jeziah Guagno state, "Confinement issues were discussed.  Under the circumstances of confinement he has not been able to gain regular access to school, which has negatively impacted his academic success."  At that meeting for Jeziah, individuals from both the Palm Beach County School District and the Palm Beach County Jail are listed as participants.

53.     From my review of the records, it is unclear whether any juveniles held in solitary confinement at the Jail was ever notified of or attended any type of meeting at the Jail regarding special education services, including any meeting that could be characterized as a manifestation determination review related to their not being able to attend educational programming as a result

17

of behavior that placed them in solitary confinement.  None of the juveniles appear to have been aware of any actions taken by the facility to review and implement their IEPs.

54.    Children held in solitary confinement are locked in their cells for the duration of the school day.  They cannot see through the windows in the cell doors.  They cannot hear through the metal doors of their cells.  They receive packets of work shoved under their doors.  They have limited access to educational materials and books.  They do not receive classroom instruction.  If they have an IEP, they do not receive specialized instruction, accommodations, or behavioral interventions – the very components that make an educational plan individually tailored and reasonably calculated to obtain educational benefit.

55.    Delivery of instruction cannot be met through a metal door where children cannot see or hear.  Moreover, minimal time with a teacher on the other side of the locked cell does not enable special education students to meet IEP goals.  On logs for the delivery of support facilitation for W.G., a child with an intellectual disability, the notes simply state that he "refused", but not that he was locked inside a concrete cell for ten months.  The Defendants have an obligation not ensure that children in the Jail are enabled meaningful access to educational programs and services.

56.    It is my opinion that the policy and practice of shoving packets of work under the cell doors of the juveniles in solitary confinement, without providing any highly specialized instruction, does not provide a free, appropriate public education (FAPE) or comply with any reasonably and adequately written IEP of students with SLD, EBD, or OHI secondary to ADHD. These students need specialized instruction and accommodations in order to access education.  For

18

example, because ADHD affects attention, hyperactivity, and impulsivity, one major IEP modification for children with ADHD is to break up large assignments into smaller parts.  Handing a child with ADHD a bundle of worksheets does not serve to make education more accessible to him or her.  In addition, these packets do not make education more accessible to those students who have significant difficulties with reading.  These cell packets hardly count as education, much less special education.

57.     When children with disabilities are placed in disciplinary solitary confinement as a result of a rule infraction, an assessment must be made as to whether the rule infraction was a result of or related to the child's disability.  Likewise, there should be reasonable accommodations in place to ensure access to education and other programs are available to children with disabilities.

58.     Additionally, due to the factor of unidentified disabilities, some of the juveniles at the Jail may actually be eligible for special education services, but due to lack of meaningful interaction with school district staff, have not received proper evaluations.  Certainly, any child held in solitary confinement for the length of time experienced by the Plaintiffs would be likely be experiencing conditions that would require additional educational disability accommodations as well as accommodations to allow them to access services and programs.  However, it is my understanding that no initial special education evaluation was conducted for those children in solitary confinement.  Furthermore, it is my understanding that none of the children in solitary confinement at the Jail was newly identified with a disability under Individuals with Disabilities

Education Act (IDEA) or the broader definition of a disability under Section 504 of the Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act.

59.    In my opinion, the pattern of solitary confinement practices by the Defendants unreasonably deprives children with disabilities access to programming as well as a denial of benefits under IDEA.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: June 20, 2018.
Northbrook, Illinois

/s/ Louis J. Kraus, MD
Louis J. Kraus, M.D.
Chief, Child and Adolescent Psychiatry
Rush University Medical Center

20

# EXHIBIT B-1

# LOUIS JAMES KRAUS, M.D., DFAPA, FAACAP
Woman's Board Professor of Child and Adolescent Psychiatry
Chief, Section of Child and Adolescent Psychiatry
Chief of Forensic Psychiatry
Rush University Medical Center

910 Skokie Boulevard, Suite 230
Northbrook, IL 60062
Office Telephone: (847) 559-0560
Cell: (847) 217-7755
Email: rkraus9@mac.com

**PERSONAL DATA:**                    Louis James Kraus, MD
                                      DOB:  12-3-1960 USA


**EDUCATION:**
1987                                  M.D., University of Health Sciences, The Chicago Medical School
1983                                  B.S., Syracuse University


**POSTGRADUATE TRAINING:**
7/1/92-6/30/94                        Child and Adolescent Psychiatry Fellow, The University of Chicago, Chicago, Illinois

10/1/88-6/30/92                       Psychiatry Resident, Northwestern University, Chicago, Illinois

7/1/91-12/31/91                       Chief Resident, Psychiatry, Northwestern University, Chicago, Illinois

7/1/87-6/30/88                        Surgical Intern, Boston University, Boston, Massachusetts


**ACADEMIC APPOINTMENTS:**
July 2016 - Present                   Professor of Clinical Psychiatry, Rush University Medical Center

July 2003 – June 2016                 Associate Professor of Clinical Psychiatry, Rush University Medical Center

March 2001 – 2002                     Visiting Associate Professor of Psychiatry, University of Illinois at Chicago

July 2001 – 2002                      Assistant Professor of Psychiatry, Northwestern University

November 1997 – July 2001            Clinical Instructor, Dept. of Psychiatry, Northwestern University

July 1994 – August 1997              Assistant Professor, Department of Psychiatry, University of Chicago

| | |
|---|---|
| July 1994 – August 1997 | Director of Child and Adolescent Forensic Psychiatry, University of Chicago |

**BOARD CERTIFICATION:**

| | |
|---|---|
| May, 2015 | Maintenance of Certification in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
| June, 1999 | Board Certified in Forensic Psychiatry, by the American Board of Psychiatry and Neurology, Certification No. 1079 |
| October, 1995 | Board certified in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
| December, 1993 | Board certified in General Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 38252 |

**LICENSE:**

| | | |
|---|---|---|
| State of Illinois | No. 036-079584 | Expires: 07/31/2020 |
| State of Florida | No. ME 83084 | Expires: 01/31/2019 |
| State of Arizona | No. 33456 | Expires: 12/03/2018 |

**HONORS AND AWARDS:**
- Child and Adolescent Psychiatry, Award: "Scholarship and Perseverance in the Creation of our Practice Parameter for Child and Adolescent Forensic Evaluations", 58th Annual Meeting, Toronto, Canada, October 2011.
- Fellow, American Academy of Child and Adolescent Psychiatry (2006)
- Distinguished Fellow, American Psychiatric Association (2004)
- Woman's Board Professor of Child and Adolescent Psychiatry, Rush University Medical Center (2004)
- AMA Glaxo Welcome Emerging Leaders Development Program (1998)
- Top Doctor – 1997 - 2001
- Resident Fellowship of The American Psychoanalytic Association (1992)
- Laughlin Fellow, Northwestern University (1991)
- Magna Cum Laude, Syracuse University
- Phi Beta Kappa Honor Society
- Honors Program in Biology, Syracuse University

**PROFESSIONAL SOCIETY MEMBERSHIPS**
American Academy of Psychiatry and the Law
Illinois Society of Child and Adolescent Psychiatry
American Psychiatric Association
American Academy of Child and Adolescent Psychiatry
American Medical Association
Illinois State Medical Society
Chicago Medical Society

Illinois Psychiatric Association

**TEACHING EXPERIENCE:**

| | |
|---|---|
| May 2008 – Present | American Psychiatric Association Mentor for psychiatric residents through the Council on Children, Adolescents and Their Families |
| July 2006 – Present | Supervise Rush child and adolescent psychiatry fellows at the Sonia Shankman Orthogenic School (a residential school) |
| July 2002 – Present | Supervise general residents and child and adolescent fellows at Rush University Medical Center |
| July 2002 – Present | Developed forensic rotation at Rush University Medical Center for child and adolescent fellows allowing them to observe forensic evaluations in court, and the Cook County Juvenile Pre-Detention Facility |
| July 2002 – Present | Develop school consult didactics as well as didactics dealing with Autism; Supervise Rush University Medical Center's child and adolescent fellows in their school Autism rotation at the Chicago Metropolitan Easter Seals Therapeutic Day Schools |
| July 2002 - Present | Develop and teach the child and adolescent forensic psychiatry course for child and adolescent psychiatry fellows at University of Illinois at Chicago and Rush University Medical Center |
| July 2002 - Present | Teach and supervise medical students in clinical rotations through child and adolescent psychiatry at Rush University Medical Center |
| March 2001 – July 2002 | Supervise and lecture residents at University of Illinois |
| August 1997 – March 2001 | Teaching and lecturing to general psychiatry residents at Northwestern University |
| August, 1997 – March 2001 | Supervise child and adolescent psychiatry residents and general psychiatry residents at Northwestern University |
| August 1994 – 1997 | Provide child and adolescent forensic psychiatry course offered to residents and fellows at the University of Chicago |
| August 1993 – 1997 | Supervise child and adolescent psychiatry fellows, psychiatry residents and psychology trainees at the University of Chicago |
| July 1991- July 1992 | Supervise psychiatry residents at Northwestern University |

**ELECTED POSITIONS:**

| | |
|---|---|
| March 2018-Present | APA Member of the Finance and Budget Committee, Investment Over Sight Committee, and the Audit Committee |
| June 2016 – Present | Delegate for AACAP to AMA |
| June 2016 - Present | Chair, Council on Science and Public Health, AMA |
| June, 2014 - 2016 | Chair Elect, Council on Science and Public Health, AMA |
| 2011 – 2013 | Chair, AACAP Assembly |
| 2011 – 2013 | AACAP Executive Committee |
| 2008 – Present | AMA Council of Science and Public Health |
| 2009 – 2011 | Vice-Chair, AACAP Assembly |
| 2007 – 2009 | Treasurer |
| 2007 – 2013 | AACAP Council |
| 2002 – 2004 | AACAP Assembly Representative to the Executive Committee |

**REVIEWER:**

Guest Reviewer – Journal of The American Academy of Child and Adolescent Psychiatry

**TRAINEES AND MENTOREES:**

| | |
|---|---|
| 2005 – Present | Ongoing Mentoring for AACAP and APA Mentor Programs |
| 2005 – 2007 (Jada Johnson, MD) | Vice Chair, Psychiatry, Illinois Masonic Hospital |
| 2002 – 2004 (Shiraz Butt, MD) | Medical Director, Maryville Academy |
| 1998 – 2000 (Lucyna Puszkarska, MD) | Medical Director, River Edge Hospital |
| 1997 – 1999 (Joseph McNally, MD) | Medical Director, Streamwood Hospital |

**PROFESSIONAL SOCIETY APPOINTMENTS**

| | |
|---|---|
| May 2015 – Present | American Psychiatric Foundation (APF BOD), Board of Directors |
| June 2014 – Present | Chair Elect – Council on Science and Public Health (CSPH), American Medical Association |
| 2014 - Present | CMS District 1, Delegate to 2014 Illinois House of Delegates |
| May 2012 – Present | Chair – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| May 2012 – May 2014 | Chicago Medical Society, District 1 Councilor |
| May 2012 – May 2013 | Chicago Medical Society District 1, Alternate Delegate to Illinois 2013 House of Delegates |
| November 2010 – June 2011 | APA Task Force on Prevention of Bullying. |
| 2009 – Present | APA Political Action Committee (PAC) Board |
| October 2009 – Present | AACAP Committee on Juvenile Justice Reform |

4

| | |
|---|---|
| April 2008 – 2009 | Member APA Council on Children, Adolescents and Their Families. |
| 2008 – Present | AACAP Delegate to AMA House of Delegates |
| May 2007 – Present | Member – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| September 2001 – Present | Co-chairman of the AACAP committee on Juvenile Justice Reform. |
| May 2001 – 2010 | Chairman of the American Psychiatric Association Committee on Juvenile Justice Issues |
| December 2000 - 2007 | AACAP Alternate Delegate to the AMA House of Delegates 2007 |
| June 2000 – June 2002 | President, Illinois Council of Child & Adolescent Psychiatry |
| December 1999 – December 2000 | AACAP Delegate for Young Physicians to the AMA |
| November 1999 - 2001 | Evanston Northwestern Healthcare Child Protection Committee |
| September 1999 – March 2001 | Member, Evanston Mental Health Board, Substance Abuse Task Force |
| June 1999 – 2001 | Member, AMA Advisory Board on Alcohol Intervention Project for Youth |
| January 1999 – January 2003 | Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| 1998- 2010 | Member of the American Psychiatric Association Committee on Juvenile Justice Issues |
| October 1998 – Present | Delegate, for The Illinois Council of Child and Adolescent Psychiatry to American Academy of Child and Adolescent Psychiatry  (AACAP) |
| September 1998 – 2000 | Clinical Advisor, Chicago Metropolitan Child and Adolescent Comprehensive Community Services Systems Network Advisory Council |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Task Force for Revision of the NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities |
| June 1997 – January 1999 | Chairperson of AACAP Committee for New Physicians |

| | |
|---|---|
| June 1997 – January 2003 | Board of Directors, National Commission on Correctional Health Care |
| January 1997 – July 2000 | Program Chairman, Illinois Council for Child and Adolescent Psychiatry |
| July 1995 – July 1996 | Program Chairman for Chicago Society for Adolescent Psychiatry |
| September 1994 – October 1999 | AACAP Committee on Foster and Adoptive Families |
| March 1994 – December 1996 | AACAP Alternate Delegate for Young Physicians to the AMA |

**CONSULTING POSITIONS**

| | |
|---|---|
| January 2013-Present | Federal Consent Decree appointment, Assessment and restructuring of the mental health programming for the Illinois Department of Juvenile Justice (IDJJ) under a Consent Decree filed with the Attorney General's Office by the American Civil Liberties Union (ACLU) of Illinois in December 2012 (RJ v. Bishop) |
| February 2006 – Present | Consultant to the ACLU |
| May 2003 – 2008 | Consultant, United States Department of Juvenile Justice, Civil Rights Division |
| March 2001 – June 2002 | Director, Child and Adolescent Forensic Psychiatry, University of Illinois at Chicago |
| 1993 – Present | Forensic testimony in Juvenile Court (abuse/neglect & delinquency), Family Court focusing on custody and expert testimony in other state and federal cases. Previously worked as an Expert for the Cook County Public Guardian's Office and DCFS. |
| September 1992-1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| 1992 - Present | Expert testimony in juvenile and domestic relations courts in a variety of cases ranging from transfer hearings, abuse including Munchausen by Proxy, Child Advocacy Focusing on Custody and "Best Interest" of the Child |
| April 1990 – June 1990 | Psychiatric Consultant to Illinois Youth Center, Joliet, Illinois; General Population and the Intensive Reintegration Unit |
| January 1990 - 1992 | City of Chicago, South East Community Mental Health Center |

**ADMINISTRATIVE SERVICES:**

| | |
|---|---|
| 2011 - Present | Development of the Autism Assessment, Research, Treatment and Services (AARTS) Center at Rush University Medical Center |

6

| | |
|---|---|
| 2006 - Present | Director of the Sonia Shankman Orthogenic School and Rush University Medical Center's clinical rotation for child and adolescent psychiatry fellows at Rush |
| 2006 – Present | Director of Psychiatric Services, Sonia Shankman Orthogenic School |
| 2002 – Present | Chief of Child and Adolescent Psychiatry, Rush University Medical Center |
| 1999 – Present | Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools |

**CLINICAL SERVICE:**

| | |
|---|---|
| 2012 - Present | Director, Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center |
| July 2005 – Present | Psychiatric Director Sonia Shankman Orthogenic School at Chicago |
| June 2005 – Present | Psychiatric Consultant to New Trier, Niles North and Niles West High Schools |
| February 2000 – June 2001 | Director, Child and Adolescent and Forensic Psychiatry, University of Illinois at Chicago |
| January 1999 – present | Medical Director, Chicago Metropolitan Easter Seals Therapeutic School |
| September 1998 – Present | Psychiatric Consultant to Evanston Township High School |
| August 1997 – February 2000 | Division Head of Child/Adolescent Psychiatry, Evanston Northwestern Healthcare |
| May 1997 – June 1999 | Psychiatric Consultant to Youth Campus (A DCFS contracting agency) |
| September 1992 – May 1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| July 1994 – August 1997 | Assistant Director of Child and Adolescent Inpatient Services, University of Chicago |

**MEDIA**

1. October 26, 1994, Chicago Sun Times, TV-Violence Line Elusive.
2. November 6, 1994, Chicago Tribune, "Mental health tests for kids spark debate;" Screening: Testing would help parents, supporters say.

3. November 19, 1994, Chicago Tribune, Try Sandifer suspect as kid, experts say.  Louis Kraus testified, "Derrick Hardaway suffers from a *conduct disorder* that developed in his early adolescence because of family tensions, physical abuse and other problems."

4. February 25, 1997, Chicago Tribune, Leniency sought for teen convicted of killing Sandifer.

5. March 13, 1997, Chicago Tribune, Return girl slowly to mom, psychiatrist say.

6. March 30, 1997, Chicago Tribune, Student-Teacher contact is becoming a danger zone. Kraus was quoted to say, "The students are drawn into the relationship because they idolize their teacher and often don't see anything wrong until much later. At that point they might feel depressed and used and have trouble forming relationships."

7. March 25, 1998, Chicago Tribune, 4 pupils, teacher die in schoolyard ambush.

8. March 25, 1998, Chicago Sun Times, Kids ambush kids; Shooting stuns school.

9. March 29, 1998, Violence is linked to genetics, early abuses that set patterns

10. April 6, 1998, Chicago Tribune, Teen smokers a pack short of a carton in wisdom department.

11. June 3, 1998, Toronto, Canada, American Psychiatric Association, The Daily Bulletin, Presidential Sessions on "A Time of Violence."

12. June 1998, Chicago Parenting, "Keeping rage from turning into tragedy."

13. August 14, 1998, Chicago Sun Times, Making Sense of kids' case.

14. August 14, 1998, Chicago Tribune, Young suspects sent home. Dr. Kraus testament was paramount in the 7-year-old being allowed to go home with his family.

15. Possley, M. and Puente, T., "Young Suspects Sent Home", Chicago Tribune, August 14, 1998

16. Kotlowitz, A., "The Unprotected", The New Yorker. February 8, 1999

17. March 7, 1999, Chicago Tribune, Aftermath an ordeal for parents, kids.

18. November 11, 1999, Northwest Herald, Boy who shot clerk sentenced.

19. February 23, 2000, Tribune Allied Health, Safety nets for teens.

20. April 9, 2000, Chicago Tribute, School provides unique antidote for depression.

21. January 30, 2001, Chicago Tribune, Files in Ryan Harris case shed new light. Disclosure of the results of the psychiatric interview changed interview process of minors.

22. December 7, 2001, Psychiatric News, AACAP Kraus was quoted "We certainly disagree with the Supreme Court ruling and believe the death penalty constitutes cruel and unusual punishment."

23. July 9, 2002, Psychiatric News, AMA Vows to Prevent Future Psychologist Prescribing Laws.

24. April 4, 2003, Study Questions Youths' Ability to Understand Trial Process, *Study Implications.*

25. July 18, 2003, Psychiatric News, Psychiatrist Wins AMA Leadership Post: *Psychiatry Scores in HOD.* Kraus argued successfully in favor of an amendment to a resolution asking that the AMA support comprehensive health education for female delinquent, including information on responsible sexual behavior and the prevention of sexually transmitted diseases and HIV/AIDS." Kraus also testified, "Medicaid reaches 44 million Americans, more than Medicare or any other form of health insurance and covers Americans who are among the poorest and most disadvantaged populations in the country."

26. February 13, 2004, Chicago, Metro North Shore, Abuse of cold medicine rising.

27. Tresniowski, A.  Hewitt, B., "Escape from Hell", People Magazine. September 25, 2006

28. Reuters, "Experts say video games not an addiction in AMA Meeting", June 25, 2007

29. Neergaard, L. "Easy nondrug helps ADHD Kids", USA Today. September 3, 2007

30. Tanner, L. "Shock Treatment Sought for Autistic Man", USA Today. September 3, 2007

31. Reuters, "Antidepressant warnings scared parents, doctors", September 9, 2007

32. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of other Youngsters", November 13, 2007

33. Bynum, R., Stobbe, M., "Experts Dubious of Ga. 3rd- Grader Plot", Associated Press. April 2, 2008

34. October 31, 2008, The Wall Street Journal, Therapy, Antidepressants Ease Anxiety in Children.

35. Tanner, L., "Kids with ADHD on meds test better than peers", Associated Press. April 27, 2009
36. Tanner, L., "Jackson kids face hurdles coping with his death, universal trauma of losing a parent may be eased if stability can be offered", Associated Press. July 5, 2009
37. Fox News, "Psychiatrists say Blagojevich's choice to have daughters join him at court may be stressful", July 7, 2010
38. FOX – Judge Jeanine, "8-year Old Boy's Commitment to a Psychiatric Ward", February 19, 2011
39. CNN, Anderson Cooper 360, "KTH: Mass. School called 'house of horrors', May 24, 2012,
40. Fox News Chicago, "Beauty may no longer be in the eye of the beholder", May 10, 2012
41. CNN, Anderson Cooper 360, "Anderson Cooper Investigates Shocking RTC Treatment", June 4, 2012
42. Moran, M. "More research needed on SSRI's for treating Autism Disorders", Psychiatric News. Volume 47, Number 11. June 11, 2012
43. CNN, Anderson Cooper 360, "Crime and Punishment, The Sandusky Trial", June 12, 2012
44. NBC News Chicago, "How to Talk to Your Kids about Conn. Shooting", December 14, 2012
45. Niedowski, E., Tanner, L. "How to Talk to Your Kids about Conn. Shooting", Associated Press. December 15, 2012
46. CNN, Anderson Cooper 360, "Former Child Hostage Describes Captivity Underground", February 4, 2013
47. Fox News Chicago, "Violence has long term effects on children", August 12, 2013
48. England, C. "Helping young adults make the transition", Chicago Medicine Magazine, September 2013
49. Schmadeke, S., "State's youth prison system violates inmates' rights, experts say", Chicago Tribune. September 25, 2013
50. NBC News, "Black Box warning on antidepressants raised suicide attempt", July 18, 2014
51. FOX News, "How far should we go to discipline our kids", September 2014
52. FOX News, "Could a self-esteem booster turn your child into a narcissist?", March 2015
53. Al Jazeera America, "US Only Nation to Imprison Kids for Life," March 2015
54. USA Today, "Psychiatrist video game focus red herring", March 2018
55. Pbs.org, "Trump said mental illness leads to gun violence.  Here's why doctors disagree", February 19, 2018,
56. Rush, "Addressing Attention Deficit Disorder",
57. The Brown University Child & Adolescent Psychopharmacology Update, "AACAP expert on young people and guns:  Treating and consulting

**SCIENTIFIC ACTIVITIES**
*a)  Grants:*

| | |
|---|---|
| 2011-Present | Effects of memantine vs. placebo on motor planning and memory in children with autism spectrum disorders. $74,176 |
| 2010 | Rush Women's Board, Assessment of prevalence of Bipolar Disorder in adolescent population in a residential placement, $30,000 |
| April, 1999 | Department of Human Service, State of Illinois Grant – Bridges Program for Development of School and Home-based Therapeutic Services for Adolescents, $100,000 per year |
| March, 1998 | Evanston Northwestern Healthcare Auxiliary Grant for Development Of a Community-based Adolescent Mental Health and Substance Abuse Program, $1,000,000 |

### b)  Research

| 2011 – Present | Development of Research Program at the Rush AARTS Center |
| 1984 - 1986 | Research under direction of Max Harry Weil, Ph.D., Chairman, Department of Medicine, University of Health Sciences, The Chicago Medical School, on the reversal of academia during cardiopulmonary resuscitation |
| 1999 – 2001 | Outcomes research focusing on adolescent dual diagnosis; early diagnosis and intervention in a community based treatment program. |

### c)  Poster Presentations

Grunewald, S., Kraus, L., Youngkin, S., Wade, K. H., Forburger, N., Owley, T., Loftin, R., Fogg, L. & Soorya, L. (May 2014). *Access to care: Familial and racial variables associated with limited service access for individuals with ASD.* Poster presented at 2014 Annual International Meeting for Autism Research (IMFAR). Atlanta, GA.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May, 1992.

## SCHOLARSHIP

### a)  Books and Chapters

1. Thomas, C.R., Kraus, L.J. "Public Policy Implications of Research on Aggression and Antisocial Behavior", The Origins of Antisocial Behavior.  Oxford University Press, 2012.
2. Galatzer-Levy, R., Kraus, L., Galatzer-Levy, J., The Scientific Basis of Child Custody Decisions. **Cambridge Press**, 2009.
3. Kessler, C., Kraus, L, The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
4. Geraghty, R., Kraus, L, Fink, P, "Assessing children's competence to stand trial and to waive Miranda rights: new directions for legal and medical decision-making in juvenile courts" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007,
5. Kraus L, Sobel, H, "Post-adjudicatory assessment of youth" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
6. Galatzer-Levy, R., Kraus, L.J., eds, The Scientific Study of Child Custody Decisions, **Wiley Press,** 1999.
7. Kraus, L, "Understanding the Relationship between Children and Caregivers" in The Scientific Basis of Child Custody Decisions, **Wiley Press**, Ed. Galatzer-Levy R. and Kraus, L 1999.
8. Leventhal, B. Kelman, J., Galatzer-Levy, R., Kraus, L., "Divorce, Custody, and Visitation in Mid-Childhood" in The Scientific Basis of Child Custody Decisions, **Wiley Press,** Ed. Galatzer-Levy R. and Kraus, L 1999.

### b)  Peer Reviewed Publications

1. 1988 Practice Parameter for "Child and Adolescent Forensic Evaluations", Kraus, L, JAACAP, Vol 50, No.12, Dec. 2011 pp1299-1312.
2. Geraghty, T.F., Kraus, L, "Treating the Mentally-Ill Offender: The Challenge of Creating an Effective, Safe and Just System," **The Journal of Criminal Law and Criminology,** Northwestern University School of Law 89 (1) Fall, 1998.
3. von Planta, M., Gluldipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Bicarbonate and Tromethamine

(Tham) Buffers Fail to Improve Resuscitability During Porcine C.P.R.," **Federation Proceedings 46** (4), 1145, 1987

4. von Planta, M, Gudipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Effects of Tromethamine and Sodium Bicarbonate Buffers During Cardiac Resuscitation," **Journal of Clinical Pharmacology 28,** 594-599, 1987

*c) Other Publications*

1. Kraus, L., Arroyo, W. "Recommendations for Juvenile Justice Reform, Second Edition", American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform. October 2005.
2. Kraus, L, Arroyo, W. Editors, "Recommendations for Juvenile Justice Reform", **Monograph**, October 2001, American Academy Child and Adolescent Psychiatry.
3. Kraus, L. "Standards for Juvenile Detention and Confinement Facilities", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
4. Kraus, L. "Females in the Juvenile Justice System", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
5. Kraus, L, Morris R. "Seclusion and Restraint Standards in Juvenile Corrections", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
6. Kraus, L, "Tackling Juvenile Justice," **AACAP News**, Volume 31, Issue 2, March/April, 2000, pp. 75-76.

## PRESENTATIONS:

Bioethics Conference, Legal and Ethical Issues in Forensic Child Custody Evaluations, Feb. 28-March 3, 2018

Harvard University Conference, "Behind Bars: Health and Human Rights in U.S. Prisons" November 28, 2017

AACAP 64th Annual Meeting, Washington, DC October 23-28, 2017

American Psychiatric Association-Annual Meeting, Atlanta, GA "Cyberbullying" Mary 14, 2016

Joslyn Center, Northfield, IL "Community based Mental Health." September 22, 2016

Sonia Shankman Orthogenic School, Chicago, IL "Child and Adolescent Psychopharmacology." September 26, 2016

Keynote Speaker, Eugene J-M.A. Thonar, PhD, Award Presentation, Rush University Medical Center, October 14, 2014

Grand Rounds, Rush University Medical Center, "Psychiatric Malpractice: Dos and Don'ts." May 21, 2014

**Chair**, AACAP Douglas B. Hansen, MD 39th Annual Review Course in Child and Adolescent Psychiatry, *Child and Adolescent Forensic Psychiatry*, Westin Chicago River North, Chicago, IL, March 22-23, 2014.

Autism, Behavioral Challenges and Complex Medical Needs (ABC) Conference, "Making Systems Work Across the Lifespan for Children with Special Needs," *Treatment and Advocacy for the Autistic Teen as they Transition into Adulthood*, Kraus, LJ, Palos Hills, IL November 22, 2013.

Illinois State Board of Education, Kraus, LJ,. **Keynote Speaker**, "The Complexity of Diagnosis and Behavior of

Students Placed Residentially." November 7, 2013.

Illinois State Board of Education, Kraus, LJ,. "Juvenile Justice, Social Maladjustment and Associated Mental Health Disorder: How do we educate this difficult population and what do we do when they get out?" November 7, 2013.

7th Congress of Asian Society for Child and Adolescent Psychiatry & Allied Professions and 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Cyberage and Child Mental Health." September 26, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair**, "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health," September 25, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health, Kraus, LJ., "DSM-V: Implications for Child and Adolescent Psychiatry," September 25, 2013, New Delhi, India.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium", *Professional Training and Requirements*, June 21, 2013.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium," *Point and Counterpoint: Adoption of Custody Evaluation Standards*, June 21, 2013.

American Psychiatric Association (APA) Annual Meeting Workshop; "A Career in Child and Adolescent Psychiatry: From a Developmental Perspective." San Francisco, CA May 22, 2013.

Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody "The Impact of Isolation Practices in Confinement Facilities," National Webinar, April 3, 2013.

19th Judicial Circuit Child Representative/Guardian ad Litem Training, "Psychology of Child Development and Age Appropriate Visitation." College of Lake County, Grayslake, Illinois, September 12, 2012.

Abraxas Education Forums; "The Role of Child and Adolescent Psychiatry in Public and Private Special Education." Woodridge, IL March 30, 2012.

Learning Disabilities Association of America, 49th International Conference, "Dissecting a Bully: Interventions for the Bullied." February 22-25, 2012, Chicago, IL.

APA Annual Meeting, "Wayward Youth Revisited", May 17, 2011, Honolulu, Hawaii.

APA Annual Meeting, "Teen Bullying", May 17, 2011, Honolulu, Hawaii.

ISBA Chicago Regional Meeting (Effective Advocacy for Juveniles with Mental Health Needs) "Diagnosis and Treatment of Mental Health in the Juvenile Justice System", May 11, 2011.

American Academy of Child and Adolescent Psychiatry (AACAP) 57th Annual Meeting, "Variations in State Decisions on Custody" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Role of the Expert in Child & Adolescent Psychiatry Malpractice " October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Advocacy for Children with Autism: How to Find the Right Services" October 29, 2010, NY, NY.

ISBA Family Law Section, Springfield, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", October15, 2010.

ISBA Family Law Section, Chicago, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", September 23, 2010.

DePaul University College of Law, "Juvenile Competency to Stand Trial and Understand Miranda", April 11, 2009.

Illinois State Bar Association (ISBA) and the Committee on Continuing Legal Education, Attorney Education in Child Custody and Visitation Matters, "Factoring a Child's Development into Custody and Visitation" November 21, 2008.

AACAP Members Forum, Practice Parameter for Child and Adolescent Forensic Evaluations, October 31, 2008.

55th Annual AACAP Meeting Chicago, "The Role of the Child Psychiatrist in Juvenile Competency" October 30, 2008.

Rush University Medical Center, Department of Pediatrics Grand Rounds, "Perspectives on Delinquency, Past and Present", August 12, 2008.

American Medical Association (AMA), "How has science impacted juvenile justice regarding competency, waiver hearings, adjudications, dispositions, and treatment (psychopharmacology)". Annual Meeting, Washington DC, July 2008.

Spring Midwest American Academy of Psychiatry and the Law (AAPL) Meeting, Chicago, IL, "Juvenile Competency to Stand Trial and Understand Miranda," Louis J. Kraus, MD, April 21, 2007.

National APA Meeting in San Diego, "Workshop on Juvenile Justice Presentation on Child Competency to Stand Trial and Understand Miranda. May 2007.

53rd Annual American Academy of Child & Adolescent Psychiatry, San Diego, CA, "The Psychiatrist's Role in Child Custody: A Mock Hearing," Louis J. Kraus, MD, October 28, 2006.

Rush University Medical Center, Department of Psychiatry Grand Rounds, "Capital Punishment for Teenagers – The Recent Supreme Court Decision Roper v Simmons: Discussion and Forensic Application of Current Neuroimaging Research on Teenagers ", April 20, 2005.

Cambridge Hospital, Department of Psychiatry Grand Rounds, "Juvenile Delinquency", September 2004

AACAP National Meeting, San Francisco – Symposium – "Addressing the Needs of Behavior Disordered

Children Within the School System", San Francisco, CA, October 25, 2002.

University of Chicago – Workshop "Early Onset Bipolar Disorder", December 14, 2001.

Juvenile Justice Reform – Media Workshop, National AACAP meeting, Honolulu, Hawaii, October 2001.

Hephzibah Children's Association – Workshop "Child and Adolescent Psychiatric Diagnoses and Medications" September 28, 2001

A&E Television Broadcast on "Shattered Innocence - Fells Acres Abuse Case", August 8, 2001

15th Annual Statewide Forensic Conference, October 16-17, 2000 Loyola University Chicago, Illinois Department of Human Services

Speaking engagements at parent groups, managed care meetings, University of Chicago, the Department of Corrections and Probation

Media interviews on television, radio and in newspapers and various publications.

American Psychiatric Association – "Littleton – One Year Later, The Assessment of the Potentially Violent Child Within The School System," May 15, 2000.

Institute of Psychoanalysis, Conference on Youth and Violence, "Diagnosis and Treatment of Delinquents in a Maximum Security Youth Center," May 12, 2000

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "Connections Program – Development of a Community-Based Adolescent Alcohol and Drug Treatment Program," May 2, 2000.

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "ADHD, Differential Diagnosis and Treatment" April 4, 2000.

New Trier High School – Peer Helping, "Adolescent Youth Violence," March 2, 2000.

Response Center, Skokie, IL, "Adolescent School Violence," February 16, 2000.

Chicago Bar Association Matrimonial Law Committee, "Physical, Mental and Emotional Abuse in Custody Cases," February 14, 2000.

Cook County Public Guardian's Office, "Domestic Violence and How It Affects Children," January 31, 2000.

Illinois Psychological Association, "Assessment of Violence in Children and Adolescents, November 11, 1999.

New Trier Township, "School Violence - Treatment and Community Intervention," May 12, 1999.
Shand Morahan Worksite Lunch Program, "Signs of ADD/ADHD and Possible Treatment," April 21, 1999.

Evanston Northwestern Healthcare Health watch Program, "Childhood Attention Deficit Disorder: Treatment Options," April 7, 1999.

Evanston Northwestern Healthcare, Department of Psychiatry, Professional Conferences, "School Violence," April 6, 1999.

The Warren Wright Adolescent Center, Stone Institute of Psychiatry, Northwestern Memorial Hospital, "Violence in Schools," November 6, 1998.

Institute for Women's Health, Evanston Northwestern Healthcare "Helping Kids Cope with Divorce," October, 1998.

Illinois Society of Child and Adolescent Psychiatry, "Juvenile Transfer Hearings – The Psychiatric Evaluation," October, 1998.

APA Meeting, Toronto, Ontario, Canada, "Treatment of Severe Delinquents in a Maximum Security Youth Center," June, 1998.

Evanston Northwestern Healthcare Pediatric Lecture Series, "The Continuum of Behavior Disorders," April, 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "Transfer Hearings in Juvenile Court: Evaluation of Behavior Disordered Youth," January, 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "The Use of Attachment Theory in Custody Evaluations," January, 1998.

Juvenile Justice Division of the Circuit Court of Cook County, "Psychiatric Assessments in Juvenile Justice Cases," June, 1997.

Chicago Bar Association-Juvenile Law Committee, "Utilizing Psychiatric Evaluations In Juvenile Justice Cases: Transfer And Dispositional Hearings," February, 1997.

Genesis Schools/Illinois Association of Counsel for Children, "Helping Incarcerated Youth Overcome Delinquency and Mental Illness," December, 1996.

University of Chicago, Laboratory School Lower School Parents Association Lecture Series, "Is My Child's Behavior Normal?" November, 1995.

CAUSES - Illinois Masonic Hospital, "Attachment Theory In The Use Of Bonding Evaluations," September, 1995.

Illinois Probation and Court Services 1995 Annual Spring Conference, "Kids Killing Kids," March, 1995.

Grand Rounds: Columbus Hospital Department of Pediatrics.  "Delinquency, Etiology and Intervention," July, 1994.

Cook County Juvenile Court, Office of the Public Guardian.  "Munchausen By Proxy," July, 1994.

Columbus Hospital, Department of Pediatrics Grand Rounds,  "Delinquency, Risk Factors, and Interventions," July, 1994.

International Correctional Education Association Conference, Chicago " Attention Deficit Hyperactivity Disorder," May, 1993.

The American Psychoanalytic Association National Conference, New York, "Attachment Theory - Forensic Implications for Best Interest of the Child," December, 1993.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May, 1992.

The University of Health Sciences, The Chicago Medical School, "Effects of Tham and NaHCO3 on Acid Base Balance During CPR," 1984.

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division:

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

### DECLARATION OF H.C.

I, H.C., pursuant to 28 U.S.C. § 1746, declare as follows:

1.  All facts stated in this declaration are true and correct to the best of my
    knowledge. I have personal knowledge of the facts contained in this
    declaration, to which I am competent to testify.

2.  I am 16 years old and have spent more than 7 months in solitary confinement
    at the Palm Beach County Jail. I entered the Jail on December 1, 2017, when
    I was 16 years old. I was immediately placed in administrative confinement
    due to keep-away conditions with other children.

3.  I was never allowed to contest or otherwise dispute my placement in solitary
    confinement, nor have I received any periodic review of my classification. I
    am being held here indefinitely. I am not aware of any ability to grieve or
    appeal my placement in solitary. I never received a copy of the inmate rules
    from the Jail, nor was I ever told that I could file a grievance.

4.  I have never received any mental health evaluations or other assessments
    concerning my well-being while I have been in solitary confinement.

6. I cannot see through my cell door, nor can I hear through my cell door.

7. I can only shower every three (3) days.

8. School is nearly impossible for me to participate in while in the Box. I can't see the chalkboard or hear the teacher. I receive worksheets under the cell door.

9. I do not get recreation very often frequently, and when I do, I am alone.

11. I am not allowed to speak with other children and have no social contact with other individuals. I am alone in my cell 23-24 hours each day. I do not know when I will ever get out.

12. I do not feel like any child should have to go through the solitary confinement experience. It is traumatic and has negatively affected my mental and physical health.

13. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

14. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: June __14th__, 2018 in West Palm Beach, Florida

H.C., Plaintiff

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division:

H.C., a minor, by and through his parent and natural
guardian Jenny C., et al., on behalf of themselves
and all others similarly situated,

Plaintiffs,

        v.

RIC BRADSHAW, Palm Beach County Sheriff, in his
individual and official capacity; et al.,

Defendants.

## DECLARATION OF J.E.

I, J.E., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am sixteen years old.  Prior to my confinement, I enjoyed playing basketball and reading. I also spent time with my family, which I miss a lot.

3. I used to live with my mom in Lake Worth, Florida. When I get out of the Palm Beach County Jail, I want to go to school and would like to be a welder when I grow up.

4. I have been diagnosed with Attention Deficit Hyperactivity Disorder, Conduct Disorder, and Mood Disorder since I was about 12 years old.  I never received any medication for my mental health issues while in solitary confinement. I have a 504 Plan in school based on my disabilities, and before being incarcerated at the Jail, I was in the 10th Grade at Lake Worth High School.

5. I struggle to do well in reading and writing without extra support from my teachers.

My disabilities make it difficult for me to pay attention for extended periods of time, and make me feel anxious, depressed, and impulsive.

6.  I have been incarcerated pre-trial and pre-adjudication at the Palm Beach County Jail since January 17, 2018 and will be held here until my criminal case is resolved.

7.  I was placed in solitary confinement indefinitely on January 17, 2018 as an administrative placement due to having co-defendant children who are also incarcerated here. I did not have to ability to contest or otherwise dispute my placement in solitary confinement, and I never received any periodic review of my classification while in solitary. In early June 2018, I was released from solitary after more than 5 months because one of my co-defendants was no longer held at the Jail.

8.  During my time in solitary, I was alone for 23-24 hours a day. I was permitted to take brief, 10-15-minute showers on Mondays, Wednesdays, and Fridays. Any opportunities for recreation were limited during which time I can go to a walled-in basketball court by myself.

9.  I did not have any visitors except from my attorneys and my probation officer. I was able to speak with my mom, but she was often unable to speak with me very much because she could not talk while she was working.

10. In my cell, there was a metal frame bed with a thin mattress, a single piece toilet and sink combination, and a stainless-steel desk and stool that are bolted into the wall and floor. Meals were delivered through a locked, sliding box situated in the door. To drink water, I had to use the sink adjoining the toilet. The water was discolored if the taps are not run frequently and the water had an unusual, sewage-like smell. Some deputies let me place my cup through the sliding box in the door and fill it with the drinking fountain water used by the children who were not in solitary. Other times deputies refused to give me water from the drinking fountain, stating, "I'm not your water boy."

11. I was required to be handcuffed each time I left the cell, including to showers, recreation, medical, and legal visits. I was completely under the control of the deputies at the Jail. For instance, I could operate the light in my cell with a switch, but on at least two occasions, a deputy responding at nighttime to noise on the wing deliberately turned on bright emergency lights and left them on so that me and the children would not be able to sleep. Another time, I was given pants to wear that deputies later decided were not the correct ones for me. Rather than exchanging the pants for proper ones, they took my only pair, and left me undressed for hours. If I try to say anything, the deputies would often state, "You don't like it? Don't get yourself arrested."

12. I had little to do in "the Box" – which is what we call the 6' x 12' solitary confinement cell. I had been locked in that cell for so long that I felt

depressed, alone, and delusional. I paced the available 4'x10' area in my cell to pass the time, and often could not stop moving. I constantly felt like I didn't have enough space. I lost about 20 pounds since entering solitary confinement. I also read, but because there were only a few new books since I got to the Box, I was stuck re-reading the same books over and over again. If I was not pacing, I just stared at the wall all day. I couldn't even sleep at night, but rather tried to get some sleep for a few hours after the 3:00 AM breakfast service. The isolation did something to you. It's crazy.

13. I also began having visual and auditory hallucinations. I heard screaming at night and would stare at the blank wall in my cell and watch a full television show. Other children held at the Jail tried to communicate with me and say that if I bang on the door to get attention, I will be sent to the psych unit, where children have their clothing taken from them, and are given a paper gown, and locked in a very cold mental health unit cell. I also experienced frequent headaches and burning sensations in my throat at night, but I did not tell anyone about them. No nurse came to visit me or talk to me about my physical or mental well-being.

14. I felt stressed, anxious, angry, and hopeless. I rarely got any visitors. No one from mental health ever came to check on me while I was in isolation, even though I had previously been receiving counseling in the community. My mom also called the Jail to explain about my disabilities and how they will worsen in confinement, but there was no change in my status.

15. I could not attend education classes or programming while in solitary like the other children. I was given no notice or hearing that after being placed in solitary confinement, I would not be able to receive typical education classes. Rather, my education in solitary consisted of sporadically receiving packets of worksheets slid under the door of my cell. I could not see any classes occurring outside of my cell because the small plexiglass window on my cell door was entirely scratched. I could not hear the instruction very well and had to stand and listen through the cracks around the door frame. The teachers held class away from the cells sometimes even in a different room, and did not speak at a volume high enough to be heard through the door. The teachers also did not help me with the worksheets, and I was unable to complete them on my own. I tried to ask for help but I felt that because there was too many children in the unit, the teachers did not have enough time to spend helping me. I felt forgotten by the teachers.

16. I filed grievances while in solitary at the Jail requesting that I be removed from solitary confinement and be allowed to participate in educational programming. After filing an initial grievance, I received a response stating that they would investigate adjusting my placement.

Weeks later, I still did not receive any response, and so I filed an appeal of my previous grievance to the division commander again requesting removal from solitary confinement and for access to education. This time, I received a response to my grievance which stated that I needed to "stop filing frivolous grievances". I appealed once again, wanting to know what was happening with my request, or to discuss a solution. This time, the response stated that because I had three "keep separates," I "[would] remain in administrative confinement" until such time that they are no longer in the Jail.

17. I do not feel like any child should have to go through this experience. I am worried that I, or any of the other children at the Jail, can be placed into or sent back to solitary confinement for indefinite periods of time, with no access to education or ability to contest the confinement.

18. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

19. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I was treated

I certify under penalty of perjury that the foregoing is true and correct.

Dated: June 2018 in West Palm Beach, Florida



J.E.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff, in
his individual and official capacity; et al.,

Defendants.

## <u>DECLARATION OF M.F.</u>

I, M.F., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my
   knowledge. I have personal knowledge of the facts contained in this declaration,
   to which I am competent to testify.

2. I am seventeen years old. I love listening to, singing, and writing music.
   Since being incarcerated, I miss being with my family. When I get out of jail
   I hope to go to college and become an architect.

3. I was held in solitary confinement pretrial and pre-adjudication from January 17,
   2018 to early June 2018 when I was released because my co-defendant was no
   longer housed at the jail. I was told that I was placed in solitary confinement due to
   keep away conditions with co-defendant children. I never received any opportunity to
   contest my placement in solitary prior to or during my time in confinement, nor did I get
   any periodic review of my classification. I spent 23-24 hours per day alone while in
   solitary confinement.

4. I have been diagnosed with Attention Deficit Hyperactivity Disorder and Conduct
   Disorder. I have also been prescribed medication to deal with my mental health issues.
   The Jail is aware of my mental health needs because I was placed directly into the
   mental health unit of the Jail when I entered.

5. My experience in the mental health unit was traumatic.  I was stripped of all my clothing, possessions, and confined to a freezing cold cell for 24 hours a day.  For the first 2 days of my stay in the mental health unit, I was not even given a paper gown, but left naked with a suicide blanket.  I was not allowed access to any educational programming, showers, recreation, phone calls, or visits while held in the mental health unit.  I stayed in the mental health unit for 3 days before being moved to solitary confinement.  Despite receiving medication and counseling prior to my arrival at the Jail, I have not received medication or therapy while in confinement.

6. In school prior to the Jail, I obtained services through an Individual Education Plan for a speech impairment, had a Behavior Intervention Plan, and received accommodations to address my individual educational needs.  My disabilities affected my ability to complete school work, pay attention, follow directions, and make appropriate decisions.  Since arriving at the Jail and being placed in solitary confinement, I received no educational services, including those previously provided to me through my IEP.  I received no notice or a hearing about not being able to receive education classes as a condition of my solitary confinement.  Even though I previously earned my GED, I am still entitled to educational services and related services through my IEP, but none have been provided.  I had no IEP meeting to explore the delivery of educational or related services.

7. In isolation, I only received visits from my attorneys.  I received my meals through a flap in the metal door of my cell.  I could not lift myself high enough to see out of the top window in the door of my cell and both that window and the one close to the ground were scratched so badly that I was unable to see through either of them.  Unless someone was speaking loudly and clearly on the other side of my door, I could not hear them properly.

8. I also had an injured leg, for which I was prescribed the use of a leg brace with a metal rod.  Upon entering the Jail, the nursing staff confirmed that the leg brace was needed.  However, after approximately one month in solitary confinement, deputies searched my cell and took away the leg brace because it had a metal rod.  No replacement brace was offered and although my leg has not fully healed, I was given no additional medical attention.

9. Sometimes I felt like I was going crazy in the Box.  I enjoy reading, but I rarely received new books, so I re-read the same books over and over again. I also started to talk to myself while I was in the Box.  I also passed the time by pacing or role playing – acting out scenes from television or movies.  I only left my cell for recreation approximately 3 times while I was in isolation.  I seldom asked to go to recreation because I felt that the

hours passed easier if I was unaware of the distinction between day and night. I began having visual hallucinations and seeing the words on the pages of my books wiggle and the pages move independently.

10. Since being in solitary confinement, I became irritable, agitated, and anxious. I felt completely cut off from others and discouraged about my future. I had nothing to do in my cell. I could not sleep at night without my medication because I heard banging from the cell next to me. I received no therapy or counseling services in the Jail. No mental health workers came to my cell. Prior to placing me in isolation, no one from the Jail spoke with me about my disabilities. My mom received a letter from PBSO upon my entry into the Jail requesting consent for a mental health examination, but I received no counseling or evaluation.

11. I filed a grievance requesting that I be freed from solitary confinement and that I be allowed to receive any educational programming or services. After several weeks of not receiving any response. I filed another grievance asking for a status on my previous grievance request. I received a response stating that they were not aware of any grievances that I filed, and that I was in solitary confinement because of the "keep separates" in the Jail. The response also requested that I write another grievance specifically directed to classification concerning any housing changes. I wrote a grievance to classification but did not receive any formal response. Rather, I was told by a deputy that I would not have any success in changing my housing status because of the other co-defendant children housed in the Jail.

12. I do not feel like any child should have to go through this experience. I am worried that I, or any of the other children at the Jail, can be placed into or sent back to solitary confinement for indefinite periods of time, with no access to education or ability to contest the confinement.

13. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

14. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated

I certify under penalty of perjury that the foregoing is true and correct.

Dated: in West Palm Beach, Florida
June 14, 2018



M.F.

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF T.M.

I, T.M., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my
   knowledge. I have personal knowledge of the facts contained in this
   declaration, to which I am competent to testify.

2. I am 16 years old and have an IEP in school for a learning disability and
   language impairment.  I have been incarcerated at the Palm Beach County
   Jail for approximately five months.

3. I was recently placed in disciplinary solitary confinement after a fight with
   another child.  At no time prior to the fight did any Jail staff attempt to
   intervene or ask me about what happened.  Even though I was not the initial
   aggressor, I received a disciplinary report and was immediately placed in
   solitary confinement.  The other child involved in the incident was not placed
   in solitary confinement.  I did not receive any disciplinary hearing or other
   opportunity to tell my side of the story or otherwise contest my placement in
   solitary confinement.  Instead, a sergeant at the Jail came to my solitary
   confinement cell and informed me that I was to remain in solitary
   confinement for the next 20 days based upon a statement from a deputy that
   I was the initial aggressor.  Again, I was given no opportunity to dispute the

allegation.  I was never told or informed that I could grieve or appeal the decision to place me in solitary confinement.

4. While in solitary confinement, I had no social interaction and could not speak to anyone.  I was alone in a small cell for 24 hours each day, except for the 5 minutes on Mondays, Wednesdays, and Fridays that I could shower.

5. While in solitary confinement, I was not allowed any access to recreation or the telephone.  In solitary confinement, I could not sleep.  I talked to myself and made up or tried to imagine stories to pass the time.

6. Before solitary confinement, I was "houseman" for the previous two months, a position I earned from having no disciplinary infractions and having good behavior.  I had extra responsibilities on the wing.  Once I received the disciplinary report, this privilege was taken from me.  I cannot be houseman again.

7. I could not participate in school while I was in solitary confinement.  I could not see the marker-board through the scratched up windows in my cell.  The teachers would stick worksheets through the crack on the side of my door, and would just leave them hanging in the door, often not checking back to see if I had done any work at all.

8. I do not feel like any child should have to go through the solitary confinement experience.  It is traumatic and negatively affected my mental and physical health.

9. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail because I feel like it could happen again to any of us at any time.

10. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: June 14, 2018 in West Palm Beach, Florida

T.M., Plaintiff

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division

H.C., a minor, by and through his parent and
natural guardian Jenny C., *et al.*, on
behalf of himself and all others similarly situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; *et al.*,

Defendants.

## DECLARATION OF W.G.

I, W.G., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am 16 years old and under the legal custody of my grandmother. I am also supervised by the Department of Children and Families after having been removed from the custody of my biological parents. When I grow up, I want to work in landscaping or have a pressure cleaning business.

3. I have been diagnosed with Attention Deficit Hyperactivity Disorder. I have an IEP for an intellectual disability, criteria for which includes an IQ below 70, and Specific Learning Disability. I have a difficult time focusing in school and require specialized instruction to learn. I am on a differentiated curriculum in school due to my disability.

4. I was charged as an adult and moved to the Palm Beach County Jail on January 9, 2017, when I was 14 years old. At first, I was placed in general population with the other children on the 12th floor. After about two weeks, I got into a fight with some other children and received a disciplinary report. I was told that I would

receive a 20-day disciplinary solitary confinement sentence as a result of my rule infraction. However, despite receiving no further disciplinary reports, I was held in solitary confinement for the next 10 months, until my move from the Jail on October 27, 2017. I did not have an opportunity to contest my solitary confinement or present any evidence, nor did I receive any periodic review of my classification.

5. When initially placed in confinement, I asked deputies whether I can get out of the Box, but was told that I had to stay away from children on both wings of the 12th floor as a result of the fight. I was never told that I could write a grievance but rather led to believe that I would be held in confinement indefinitely. I did not write a formal grievance and did not know how to use the grievance process. Eventually, I lost hope and stopped asking to get out. No one from the Jail inquired as to my intellectual or mental health disabilities prior to or during my placement in the Box. No one from the Jail ever offered me additional assistance due to my intellectual or mental health disabilities, or provided me with access to medication for my mental health issues. There rarely were any checks made of me while I was in solitary.

6. I had no physical or social stimulation while in the Box. I was alone in the cell for 23-24 hours a day. I gained weight in solitary confinement due to lack of exercise. In fact, after leaving the Box, my body "hurt to move" as it had been inactive for such a long time. During my 10 months in solitary confinement, I only had visits from my attorney and my Department of Children and Families case manager. Any time I left my cell, I was handcuffed. I adapted my sleep schedule to sleep during the day and be awake at night, but only for a few hours. Many of the children in solitary adapt to this sleep cycle. I always felt tired, confused, and upset. I tried to utilize his opportunities for recreation, but was often denied the privilege because other children were utilizing the recreation space. I was not allowed to have any interaction with other children or people at the Jail.

7. I wanted to read to "keep from going crazy" in confinement, but I am not a strong reader and new books were not regularly offered. I wanted to write songs to occupy my time, but I found that I could not focus enough to do so.

8. I began experiencing headaches, as well as back pain from a previous automobile accident. I made a sick call and was given "red pills" from the Jail medical staff, charged to my canteen funds. The pills did not help relieve any pain or stress. I also felt that I needed glasses to see while in confinement, but I was never given any vision screening.

9. I became irritable and frustrated, and would yell for the deputies on duty, in a desperate attempt to engage in some social interaction. I would repeatedly try to talk to Jail staff, by asking to use the phone, for water, and for soap, but the deputies would ignore me. I would beat on my cell door to get attention, only to be

would threaten by deputies to a fight.  Deputies also routinely threatened to take away my showers, phone calls, and attorney visits.  Some deputies would even refuse to let me out of the Box for recreation.  Other times, deputies would "toss" my cell during searches, deliberately tearing up or throwing away my possessions.  Deputies would bang on the door to get me up and if I didn't get out of bed in five minutes, I would have a 24 hour lockdown in my cell, without any privileges.  To drink water while in deadlock, I would have to ask the deputies to bring me water with a cup sent through the food flap of the cell door.  Some deputies would refuse, leaving drinking water from the sink as the only option.  The sink, adjoining the toilet, would often have discolored, odorous water, which I would try to run until it became clear in order to drink it.

10. All the children on the 12th floor are aware that the mental health unit is a place where inmates are sent, stripped of their clothing and belongings, given a paper gown, and forced into a locked, cold cell.  Although I never went to the mental health unit, I heard deputies make threats to children in confinement who were loud or disruptive.  These deputies say things like, "What's that?  You're going to kill yourself?" knowing that the mental health unit is not a place you want to be sent to.

11. For school, I would need to stand the entire time in order to try to see through the badly scratched window in my cell door or hear through the cracks around the door frame.  Due to my back injuries, standing was painful for me.  I explained this issue to my teachers, but no accommodations were made or alternative to delivering the education curriculum discussed or created.  My only option remained standing and trying to see and hear through the metal door of my cell.  I was given some work for school under my door.  I could not access educational services and struggled working independently with reading and math.  I cannot read big words.  I would yell through the door if I had a question, and some of the school staff would respond, but then leave quickly as they had to give attention to others.  Some classes were held in other rooms entirely and I had no access to this instruction. I participated in one IEP meeting on May 25, 2017, but my attendance lasted only 10 minutes.  Eventually, I gave up on trying to observe school or engage school staff from the confines of my Box and would stay asleep instead.  After my release from the Jail, at an IEP meeting on November 28, 2017, the support facilitator who worked with me at the Jail acknowledged in conference notes that there were several accommodations that I was unable to receive while in confinement at the Jail.

12. My family has noticed a difference in me, which they believe was caused by solitary confinement.  They noticed that I don't feel comfortable around others my age, and I am constantly concerned that other children or adults will make aggressive or negative attacks towards me.

13. I do not feel like any child should have to go through the solitary confinement experience. It was traumatic and negatively affected my mental and physical health.

14. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

15. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May 23 2018 in Tampa, Florida



W.G., Plaintiff

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division:

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF J.G.

I, J.G., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am 18 years old. I enjoy reading and would like to be a mechanic or city employee when I get out of Jail. I miss playing sports, especially football, going to the library, and helping take care of my younger siblings.

3. I have been diagnosed with Attention Deficit Hyperactivity Disorder. In school, I had an IEP for an Emotional Behavioral Disability. I was in many home placements growing up and was later adjudicated dependent and placed under the custody and supervision of the Department of Children and Families. I have been prescribed psychotropic medication for my disability and participated in counseling in the community and through school.

4. I was charged as an adult at age 16 and was held in solitary confinement on the 12th floor. Since turning 18 years old in December 2017, I continue to be held in solitary confinement on one of the adult floors of the Jail.

5. When I was first placed at the Jail from March to July 2016, I received a disciplinary report after a fight with another child and spent about 3 months in solitary confinement.

6. During this time in solitary, I would have 15 minutes to speak with family on the phone. However, on one occasion before my phone call was to end, a deputy unplugged the phone. Because the telephone was my only social interaction while in isolation, I was upset that my time ended early. I flooded my cell with water from the toilet out of frustration. The deputies came to my cell and told me to "cuff up", where I had to put my hands behind my back to be handcuffed. While handcuffed, I was pushed against a wall, and a deputy hit me while my back was turned. I resisted and fell to the floor. The deputies stomped on me and my face was slammed against the cement floor, breaking my two front teeth. My chin was split open, which later required to be sutured closed. I was taken to the mental health unit, where I had my clothes taken from me, given a paper gown, and was locked in another cell overnight without receiving any medical attention.

7. The following day, I was taken to the medical unit of the Jail. I was given gauze to keep in my mouth to soak up the blood. A few days later I was taken out of the Jail to have surgery to remove the remnants of my front teeth which were impacted in my gums. I was then given ill-fitting dentures that clipped on to my other teeth and returned to solitary confinement. The incident report listed the assault by the deputies as a slip and fall. When I tried to file a grievance about the use of force and ensuing injuries, I was told that the time to make a claim had expired. I was told by Jail staff that one of the deputies who hurt me was reassigned, along with the sergeant who was on duty, but I have witnessed that the other two deputies who were present are still on assignment at the Jail.

8. After two more months in solitary confinement, I was released to my father. But two weeks later, in August 2016, I returned to the Jail. I was immediately placed in solitary confinement upon my return. This time, I was placed in administrative solitary confinement and was told that classification would review my isolation each week. However, I remained in solitary confinement until December 2017 – approximately 16 months.

9. I continued to be a target for the deputies while in confinement. About two weeks after my return to the Jail, a deputy accused me of failing to return my food tray. Despite my denial, the deputy entered my cell and pepper sprayed me. When the tray was not found in my cell, and after arguing that the deputy should not be coming into my cell alone, I was moved to the other wing on the 12th floor.

10. Also, I still had my denture clips, but found them to be loose and uncomfortable. I took them out when I slept, but did not have a special container for them, so I used a covered cup, filled with water, in which to keep them. In October 2017, while my denture clips were in my cell, but not in my mouth, deputies tossed my cell and threw away the denture piece. The incident was not written so I could not have them replaced. The same deputy involved in the original incident where my teeth were slammed on the floor simply looked at me and laughed when the dentures where thrown away.

11. While I was in confinement, another PBSO staff member told me that she would have other inmates assault me if I got out of confinement. I called the PREA (Prison Rape Elimination Act) hotline but received no follow up in response. In December 2017, weeks before my 18th birthday, I was released from solitary confinement. I was in constant fear of receiving a disciplinary report and being returned to the Box. I was assaulted shortly after my placement with the other children in general population. I received a disciplinary report and was returned to solitary confinement.

12. While I was in solitary confinement, deputies regularly provoked me by threatening and taunting me. Corrections officers repeatedly knocked on my cell door during the night to keep me from falling asleep. While in solitary confinement, I had my recreation and access to drinking water from the fountain taken away by deputies. Deputies threatened me at least 10 times with a trip to the "psych cell", the mental health unit where I would have no clothes, a paper gown, and be locked in a cold cell if I wasn't quiet. I had instances where all my personal items, including drawings, paperwork, sweaters, socks, undergarments, and the sheets off my bed would be taken from me for hours at a time as punishment for banging on my door or talking to other children.

13. In confinement, I felt total isolation. While on the 12th floor of the Jail, I would spend 23-24 hours per day alone. I would repeatedly ask the deputies what time it was so as to engage in some social interaction. I would get to a point of such extreme frustration that I would act out. After I had been in isolation for 11 months, I began to draw pictures or rip them from books or newspapers and paste them to the wall of my cell with toothpaste, trying to find something to do. Staff would see my strange behavior, but ignore me.

14. I lost approximately 20 pounds while in confinement. My sleep patterns have become completely irregular. Even after moving to the adult floors of the Jail, I have had multiple days of insomnia. I have become extremely anxious and constantly feel pent up with energy. I have not received any of my prescribed medication for my mental health conditions since coming to the Jail more than 1.5 years ago. I had been receiving counseling from the school

district as a related service through my IEP, but that stopped completely in June 2017 without any prior written notice from the school district. After approximately 4 or 5 months in solitary confinement, I requested a sick call and told the Jail doctor that I was depressed and needed medication. The doctor told me that he would get in touch with my grandmother, who is my guardian, but I never heard anything after that.

15. During my solitary confinement I harmed myself by cutting my fingers on a metal piece in my cell, so that I had an excuse to be taken out of my cell. I required 12 stitches from this injury. I did not receive any mental health treatment from the Jail.

16. I filed multiple grievances regarding my confinement. My grievances would be ignored, returned as not able to be processed, or returned without a reason as to why I was still held in isolation. At one point, after I had been in isolation for over a year, a Captain at the Jail talked to me and said he would review my status and let me out of the Box, but this change never occurred. I continued to file grievances, but some deputies refused to accept the grievances and other deputies would tell me to turn it in to the deputy on the next shift. Other times I would be told by Jail staff that my grievances got lost. I felt overwhelmingly frustrated and angry about continuing to be held in solitary confinement. I was released from solitary confinement approximately 3 months after the conversation with the Jail captain in December 2017, the same month I turned 18 years old.

17. The lack of access to educational programming, especially services required by my IEP, also caused me frustration while in the Box. At an IEP meeting, I explained to school staff that it was difficult to see and hear any of the class instruction while I was in the Box, but my concerns were not recorded in conference notes nor addressed by school staff. I could not see out of the scratched plexiglass window of my cell, felt that I could not keep up with what was happening in the class, was told to work on my own with papers slid under my door, failed to receive the help needed to understand the work, and attempted to listen to school through the gaps in the sides and bottom of the cell door. I was routinely told by school staff that they would come by after they were done teaching, but I would usually receive no more than a minute or two of attention.

18. When I was in school outside of the Box, I recall that my grades were better, I could sit near a teacher, and I received instructional support throughout the school day. When I was placed in solitary confinement, I received no notice that my educational services would be removed as a condition of my isolation. Eventually, I found no reason at all to wake up when school was occurring on the other side of my cell door. After I moved to the adult floors, an IEP

meeting was held on February 13, 2018, and the conference notes state that, "Under the circumstances of confinement he has not been able to gain regular access to school, which has negatively impacted his academic success." No attempts have been made to improve the method of instruction for me or other children in solitary confinement.

19. Soon after entering the adult side of the Jail, I was once again placed in solitary confinement.

20. I want to be released from solitary confinement. My experience in solitary confinement has been traumatic and I do not want any other children to go through what I did.

21. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

22. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May _18_, 2018 in West Palm Beach, Florida

Jeziah Guagno

J.G., Plaintiff

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division:

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF B.D.

I, B.D., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am 18 years old and spent more than 11 months in solitary confinement at the Palm Beach County Jail.  I entered the Jail on December 5, 2016 when I was 16 years old.  After about two weeks, I was placed in administrative confinement due to keep-away conditions with other children indefinitely.  I never received any opportunity to contest my solitary confinement or any periodic review of my classification. I was released from solitary confinement in November 2017, one month before my 18th birthday, when my keep-aways left the Jail.

3. I was diagnosed with ADHD and bipolar and had an IEP in school.  I was prescribed psychotropic medication in the community and discussed my diagnoses and medication with classification at the Jail.  However, I was never visited by a psychiatrist or therapist from the Jail while in solitary confinement.

4. I tried not to thinking about the fact that I was enclosed behind four walls for 23-24 hours a day for fear of "going crazy." At first, I would try to exercise my limited opportunities to leave my cell and go to the walled-in basketball court for solitary recreation. I wouldn't move around, but would sit outside on the cement ground, close my eyes, try to listen for birds calling around me, and just breathe. After about six months in solitary confinement, however, I refused to go outside at all because the presence of air and life outside, compared to the stale and lifeless confinement in a cell, was too difficult for me to process.

5. I passed the time by doing anything I could within my solitary confinement cell – I kicked my door, threw things in my cell, talked to myself, sang, and danced. One time, I was being too loud in my cell and was sent to the mental health unit because of a false allegation that I was going to kill myself. The trip to the mental health unit involved losing my privileges, having clothes removed, being given a paper gown, and being locked in a cold cell without phone calls, showers, or recreation.

6. School was nearly impossible for me to participate in while in the Box. I would have to stand at the door for the duration of the school day. I would receive worksheets under the cell door. I would call to teachers but receive no response. No one made attempts to meaningfully deliver instruction to me or the other children in solitary. I did not receive highly specialized instruction, an IEP designed to meet my educational needs and ensure educational progress, or a given an appropriate public education during my almost one year behind the walls in solitary confinement.

7. I filed multiple grievances regarding my confinement status. One time I received no response. The second time I received my grievance back with a signature but without an answer as to when I would be released. To the third grievance that I wrote, the response stated that I had too many keep-aways to be released from confinement. I received no additional disciplinary reports during my more than 11 months in confinement, but was held without access to available educational programming, social interaction, and mental stimulation that I wanted and needed.

8. I do not feel like any child should have to go through the solitary confinement experience. It was traumatic and negatively affected my mental and physical health.

9. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

10. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May 21, 2018 in Gainesville, Florida

_____

B.D., Plaintiff

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF J.O.

I, J.O., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am 18 years old. I have a close relationship with my father, but because my mother lives in Haiti, I do not frequently speak with her. I enjoy riding dirt bikes and playing basketball. I would like to be a small engine mechanic one day.

3. I entered the Jail in August 2017 and was in solitary confinement at the Jail for approximately 5 months. I would be locked in my cell for 23-24 hours a day. I was initially placed in solitary after a disciplinary report, from about September 26, 2017 to October 11, 2017. I was later moved to general population for a couple of weeks and then placed back in solitary at the end of October 2017. I was kept in solitary until my move from the Jail on February 28, 2018. I would be locked in my cell for 23-24 hours a day.

4.  I looked forward to speaking with my father on the phone, which was my only
    social connection while in solitary. My father would drive to the parking lot
    of the Jail each night and flash his headlights so that I could see them, which
    would be the only reprieve I had from the constant sense of loneliness.

5.  I was only permitted a brief shower on Mondays, Wednesdays, and Fridays,
    and maybe an additional day if I had a court hearing. I was offered
    recreation inconsistently and my opportunity for recreation depended on the
    scheduling of all the other children in solitary confinement.

6.  I gained about 20 pounds in the Box due to my inability to move. I also found
    sleep difficult in the Box. I had to drink water out of the sink adjoining the
    toilet, which was discolored, had a bad odor, and tasted different than normal
    drinking water. Sometimes deputies would provide water in a cup through
    the food flap of the locked, metal door, but others would refuse, saying, "I'm
    not your water boy." I also experienced threats from Jail deputies. One
    deputy tried to intimidate me and stated, "Didn't you hear what happened to
    J--?", referring to J.G. and the assault by deputies causing him to lose his
    front teeth. Another time, someone urinated under my cell door. I asked
    deputies repeatedly for a mop to clean the cell but was ignored. When I
    finally gave up and washed the urine with water from my sink, I was accused
    of trying to flood the room and received a disciplinary report along with 10
    days without recreation.

7.  In solitary confinement, I became despondent and hopeless. I was sent to the
    mental health unit at the Jail on two occasions. The first time, I was in
    general population with the other children on the 12th floor. I was on the bed
    in my cell, reading a book, when children on the other sides of my cell were
    banging on the doors of their cells. A deputy came to my cell and accused me
    of making noise. When I denied making the noise, the deputy falsely accused
    me of saying I was going to kill myself. Two deputies came into my cell, put
    their knees in my back and hit me so they could handcuff me with my arms
    behind my back. I was taken to South 3A, the mental health unit on the 3rd
    floor of the Jail. My outer garments and undergarments were ripped off by
    deputies using a hook. I felt so violated. Being handcuffed and having my
    clothes ripped off my body by grown men with batons, and pepper spray felt
    like a sexual assault. I was given only a paper gown which was thin, ripped
    easily, and was completely open in the back. Then I was confined to a cold,
    locked cell. Because of the incident, I was given a disciplinary report and 10
    days disciplinary confinement.

8.  The second time I was sent to the mental health unit was in December 2017.
    While in solitary confinement, I stood on my desk to speak to another child in
    the neighboring cell through a crack in the wall. A deputy told me to get off

the desk, but I did not immediately comply. As a result, the deputy called the sergeant and accused me of trying to kill myself by jumping off the desk. I experienced the same process as the first time: handcuffed, dragged to the psych ward, clothes ripped from my body, and left in a cold, locked cell. The mental health unit cells have a glass wall on the front, so the inmates can be observed at all times. I was left for the entire stay without a partition to protect me from the view of the adult prisoners around me. I remained in the mental health unit for the entire weekend. When I returned to the 12th floor, I was once again in solitary confinement.

9.  I was not able to participate meaningfully in school while in solitary confinement. I did not receive any notice or hearing that I would not be able to participate in the typical educational programming while in solitary confinement. Even though I would often speak to the guidance counselors at all my schools in the community, I was not offered these services in the Jail. In my cell, I would receive packets of work instead of actual class participation. No one would follow up to ensure that I understood or completed my packets of work. I tried to stand by the cell door to see what was happening during school, but the window was scratched so badly that I could not see through it. Also, I had a pole and stairs in front of my cell, blocking my ability to see the classroom board. I would call out loudly from my cell to teachers for help, but they would rarely respond. Some teachers would come to my door for a few minutes, but then would need to return to teaching the rest of the children in general population. Some teachers would refuse to come to the cell door at all. I told the school staff that I could not see or hear the instruction, but no attempts were made to change the method of instruction and accommodate the situation for me or other children in solitary confinement.

10. I began having visual and auditory hallucinations in solitary confinement. I saw a third arm coming from my body and began hearing voices, especially at night. Jail deputies would see my strange behavior, but leave me inside.

11. Initially, when I inquired about grieving my solitary confinement status, deputies told me it was useless to write grievances. Then, once I began writing formal grievances, I never heard back. I tried again to file a grievance with a different deputy, but again received no response. I was told by one deputy that I had keep-aways and they would not let me out. I even spoke to the Sergeant about the issues I was having in confinement but was told that there was no possibility of getting out.

12. Although my visual hallucinations have stopped, I continue to hear voices. The voices are both male and female. Other children and adults that interact with me now say that the Jail messed me up. I am told that I speak

unusually.  My gait is abnormal, with a wide-legged wobble that was not there before I entered the Box.  I also feel myself snap at others for no reason. My sleep patterns have not returned to normal and I do not sleep at night.  I don't trust anyone around me.  My heightened paranoia makes me take a seat at the back of the room in class because I feel I need to keep watch on those around me.

13. My experience in solitary confinement has been traumatic and I do not want any other children to go through what I did.

14. I am willing to serve as a class representative on behalf of all similarly situated present and future children held in solitary confinement at the Palm Beach County Jail.

15. I know that I am representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to make sure that the Palm Beach County Jail can't treat anyone else the same way that I have been treated

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May **16** , 2018 in West Palm Beach, Florida

_____
J.O., Plaintiff

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

H.C., a minor, by and through his parent and
natural guardian, Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF JENNY C

I, Jenny C., pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my
   knowledge. I have personal knowledge of the facts contained in this
   declaration, to which I am competent to testify.

2. I am the mother and guardian of H.C., a named Plaintiff in this action. I am
   acting as his representative pursuant to Rule 17 (c)(1) of the Federal Rules of
   Civil Procedure. I fully support my son in his role as class representative in
   this action.

3. At all relevant times, my son, H.C., was, and continues to be, incarcerated at
   the Palm Beach County Jail ("Jail").

4. Being a class representative is a significant responsibility, and involves
   representing more than just our own interests in the case. That
   responsibility is one I am willing to share with my son. I want to represent
   my son in this case to ensure that neither he nor any other children are put

in solitary confinement again and also that he and all children at the Jail get education and other services needed.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: June 18, 2018, in West Palm Beach, Florida.

Jenny C., mother and
guardian of Plaintiff H.C.

# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF NEHOMIE PERCEVAL

I, Nehomie Perceval, pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my
   knowledge. I have personal knowledge of the facts contained in this
   declaration, to which I am competent to testify.

2. I am the mother and guardian of J.E., a named Plaintiff in this action. I am
   acting as his representative pursuant to Rule 17 (c)(1) of the Federal Rules of
   Civil Procedure. I fully support my son in his role as class representative in
   this action.

3. Since January 17, 2018, my son, J.E., was, and continues to be incarcerated
   at the Palm Beach County Jail ("Jail").

4. I have contacted the Jail about the detrimental effect of solitary confinement
   has on my son, J.E. I also told the judge in my son's criminal case that I am
   worried about his mental state when he is held in solitary

confinement.  However, despite my pleas, my son continues to be held in solitary confinement without any services or access to education.

5. Being a class representative is a significant responsibility, and involves representing more than just our own interests in the case.  That responsibility is one I am willing to share with my son.  I want to represent my son in this case to ensure that neither he nor any other children are put in solitary confinement again and also that he and all children at the Jail get education and other services needed.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May _13_, 2018, in West Palm Beach, Florida.

Nehemie Naomi Perceval, mother and
guardian of Plaintiff J.E.

# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division:

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## <u>DECLARATION OF ASISA ROLLE</u>

I, Asisa Rolle, pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I am over the age of 18 and have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am the mother and guardian of M.F., a named Plaintiff in this action. I am acting as his representative pursuant to Rule 17 (c)(1) of the Federal Rules of Civil Procedure. I fully support my son in his role as class representative in this action.

3. My son, M.F., has continuously been held in solitary confinement and imprisoned in Palm Beach County Jail since January 17, 2018.   Jail.

4.     My son suffers from mental health issues for which he has been prescribed psychotropic medication. I have contacted the Jail on numerous occasions to try and sent to get appropriate mental health services for my son. However, despite my pleas, my son continues to be held in solitary confinement without his prescribed psychotropic medication.

5. Being a class representative is a significant responsibility, and involves representing more than just our own interests in the case. That responsibility is one I am willing to share with my son. I want to represent my son in this case to ensure that neither he nor any other children are put in solitary confinement again and also that he and all children at the Jail get education and other services needed.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May ____, 2018, in West Palm Beach, Florida.

Asisa Rolle, mother and
guardian of Plaintiff M.F.

# EXHIBIT N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF JESSICA JOINER

I, Jessica Joiner, pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am the mother and guardian of T.M., a named Plaintiff in this action. I am acting as his representative pursuant to Rule 17 (c)(1) of the Federal Rules of Civil Procedure. I fully support my son in his role as class representative in this action.

3. At all relevant times, my son, T.M., was, and continues to be, incarcerated at the Palm Beach County Jail ("Jail").

4. I was not informed that my son, T.M., was being placed in solitary confinement. I contacted the Jail and was told that they couldn't give me any information because he is a minor, but that I would be able to call and speak with him on June 8, 2018.

5. No one from the Palm Beach County School District called to tell me that my son, T.M., would not be receiving regular educational services, such as being in a class with his peers, while in solitary confinement.

6. Being a class representative is a significant responsibility, and involves representing more than just our own interests in the case. That responsibility is one I am willing to share with my son. I want to represent my son in this case to ensure that neither he nor any other children are put in solitary confinement again and also that he and all children at the Jail get education and other services needed.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: June 13, 2018, in West Palm Beach, Florida.

Jessica Joiner, mother and
guardian of Plaintiff T.M.

# EXHIBIT O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Division:

H.C., a minor, by and through his parent and
natural guardian Jenny C., et al., on
behalf of themselves and all others similarly
situated,

Plaintiffs,

     v.

RIC BRADSHAW, Palm Beach County Sheriff,
in his individual and official capacity; et al.,

Defendants.

## DECLARATION OF DOROTHY WILFORK

I, Dorothy Wilfork, pursuant to 28 U.S.C. § 1746, declare as follows:

1. All facts stated in this declaration are true and correct to the best of my knowledge. I have personal knowledge of the facts contained in this declaration, to which I am competent to testify.

2. I am the grandmother and guardian of W.G., a named Plaintiff in this action. I am acting as his representative pursuant to Rule 17 (c)(1) of the Federal Rules of Civil Procedure. I fully support my grandson in his role as class representative in this action.

3. At all relevant times, my grandson, W.G., was incarcerated at the Palm Beach County Jail ("Jail").

4. Being a class representative is a significant responsibility, and involves representing more than just our own interests in the case. That responsibility is one I am willing to share with my grandson. I want to represent my grandson in this case to ensure that neither he nor any other

children are put in solitary confinement again and also that he and all children at the Jail get education and other services needed.

**I certify under penalty of perjury that the foregoing is true and correct.**

Dated: May 20, 2018, in West Palm Beach, Florida.

Dorothy Wilfork, grandmother
and guardian of Plaintiff W.G.